UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

FUNBAR HALL LLC, LAURA
DUNBAR,

        Plaintiffs,

        v.

NATIONAL FIRE AND MARINE
INSURANCE COMPANY,

        Defendant.

Case No. 2:25-cv-318-KCD-DNF

_____/

## ORDER

Before the Court is Defendant National Fire and Marine Insurance Company's Motion for Summary Judgment, asking the Court to limit Plaintiffs' recovery for damages from Hurricane Ian consistent with the terms of an insurance policy. (Doc. 26.)[1] Plaintiffs have responded (Doc. 27), and National Fire replied (Doc. 38), making this matter ripe. For the reasons below, the motion is **GRANTED IN PART AND DENIED IN PART**.

## I. Background

The facts needed to decide this motion are few and undisputed. Plaintiffs' rental property was damaged by Hurricane Ian. Following the storm, they made a claim with National Fire. National Fire adjusted the claim and issued a payment to Plaintiffs for the actual cash value (ACV) of

---

[1] Unless otherwise indicated, all internal quotation marks, citations, case history, and alterations have been omitted in this and later citations.

the covered damage. The underlying policy defines ACV as "the cost to repair or replace covered property . . . subject to a deduction for deterioration, depreciation and obsolescence[.]" (Doc. 26-1 at 12.)[2] In other words, ACV pays what the used property was worth just before the storm, not the price of a brand-new version.

Plaintiffs, however, believe they are owed more. Relying on estimates from their contractors, they seek the "replacement cost value" (RCV)—the full cost to repair the damage without any deduction for depreciation. And the price tag is significant. Tradewinds Custom Homes estimates it will cost $343,380 to replace windows and doors, and another $719,090 for various other repairs. Saint Raphael Roofing quotes another $176,240 for the roof. (Doc. 26-3 at 2; Doc. 26-5, Doc. 26-6.)

But there is a snag. Plaintiffs have not yet performed any of these repairs. And National Fire argues that under the plain terms of the policy, an insured cannot recover RCV until they actually replace what was lost.

## II. Legal Standard

Summary judgment is not a substitute for trial. It is appropriate only "when a movant shows that there is no genuine dispute as to any material fact and [he] is entitled to judgment as a matter of law." *Gonzalez v. Indep.*

---

[2] The Court will cite to the page numbers generated by its electronic filing system for all exhibits.

*Ord. of Foresters*, No. 24-10758, 2025 WL 337898, at \*2 (11th Cir. Jan. 30, 2025). "When deciding a motion for summary judgment, a judge is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Las Brisas Condo. Homes Condo. Ass'n, Inc. v. Empire Indem. Ins. Co.*, No. 2:21-CV-41-KCD, 2023 WL 8978168, at \*1 (M.D. Fla. Dec. 28, 2023). "An issue is genuine if a reasonable jury could return a verdict for the nonmoving party." *Do v. Geico Gen. Ins. Co.*, No. 1:17-CV-23041-JLK, 2019 WL 331295, at \*2 (S.D. Fla. Jan. 25, 2019).

"The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial." *Andrews v. Ciccone*, No. 3:23-CV-88-MMH-SJH, 2025 WL 2508878, at \*2 (M.D. Fla. Sept. 2, 2025). "[A] fact is material if it may affect the outcome of the case under the applicable substantive law." *Toca v. Debonair Props. LLC*, No. 2:23-CV-303-KCD, 2025 WL 2106674 (M.D. Fla. July 28, 2025).

"When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings," and by its own evidence, "designate specific facts showing that there is a genuine issue for trial." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593-94 (11th Cir. 1995). This requires the nonmovant to "identify specific evidence in the record" and "articulate the

precise manner in which that evidence supports [its] claim." *Alexander as trustee of Franklin Pharmacy, LLC v. Aaron*, No. 3:15-CV-1314-AKK, 2017 WL 11437294, at *1 (N.D. Ala. June 1, 2017); *see also Diaz v. Kaplan Higher Educ., L.L.C.*, 820 F.3d 172, 177 (5th Cir. 2016).

### III. Discussion

National Fire advances three primary arguments for limiting Plaintiffs' recovery. First, it contends that because Plaintiffs have not yet undertaken repairs, the policy restricts their recovery to the ACV of the damaged property. (Doc. 26 at 7-9.) This limitation, National Fire argues, necessarily precludes recovery for undamaged portions of the property—whether sought for aesthetic matching or mechanical access—because such items did not sustain "direct physical loss" as defined by the policy. (*Id.* at 11-14.)

Second, National Fire claims that Plaintiffs cannot recover "ordinance or law" damages (increased costs to comply with building codes) because the policy coverage for such costs is triggered only when they are actually incurred. (*Id.* at 14.)

Finally, National Fire argues that the policy contains a specific exclusion barring coverage for aluminum-framed screen enclosures. (*Id.* at 15.) The Court addresses each issue in turn.

## A. Plaintiffs' Damages are Limited to ACV

National Fire's first argument presents a discrete question of contract interpretation: does the policy limit Plaintiffs to ACV when they have not yet repaired their property? Because this Court sits in diversity, the answer depends on Florida substantive law. *Glob. Quest, LLC v. Horizon Yachts, Inc.*, 849 F.3d 1022, 1027 (11th Cir. 2017). And because the interpretation of an insurance policy is a matter of law, the answer lies in the text of the agreement itself. *Fabricant v. Kemper Indep. Ins. Co.*, 474 F. Supp. 2d 1328, 1330 (S.D. Fla. 2007).

The policy establishes a clear, two-step process for settling losses. First, National Fire must "initially pay at least the actual cash value of the damage." (Doc. 26-1 at 27.) It will "then pay any remaining amounts necessary to perform such repairs," but only "as the work is performed and the expenses are incurred." (*Id.*) This pay-as-you-go structure is not unique; it mirrors the requirements of Fla. Stat. § 627.7011(3)(a). Consequently, courts applying Florida law have reached a near-uniform consensus: "an insurance company's liability for replacement cost does not arise until the repair or replacement has been completed." *Ceballo v. Citizens Prop. Ins. Corp.*, 967 So. 2d 811, 815 (Fla. 2007); *see also CMR Constr. & Roofing, LLC v. Empire Indem. Ins. Co.*, 843 F. App'x 189, 192 (11th Cir. 2021).

5

Plaintiffs do not claim to have repaired their home. Instead, they argue that the rules of the game change once a lawsuit is filed. Their theory is that because they are suing for breach of contract, they are immediately entitled to all recoverable damages—including RCV—regardless of whether they have incurred the expense. (Doc. 27 at 14-19.)

But that argument runs headlong into the policy's plain text. National Fire does not dispute that RCV is recoverable in the abstract, nor does it deny that RCV might eventually include costs to repair undamaged parts of the home. (Doc. 28 at 1-2.) The dispute, then, is purely about *timing*. The policy divides indemnity benefits into two buckets: ACV, which is paid based on the value of the damage, and RCV, which covers the "actual cost necessary to repair or replace." (Doc. 26-1 at 27.) Access to the second bucket is conditional. Plaintiffs are not entitled to those funds unless and until "work is performed and expenses incurred." (*Id.*) "[C]ourts are not to rewrite insurance contracts and should bear in mind that if a policy provision is clear and unambiguous, it should be enforced according to its terms whether it is a basic policy provision or an exclusionary provision." *Universal Prop. & Cas. Ins. Co. v. Qureshi*, 396 So. 3d 564, 567 (Fla. Dist. Ct. App. 2024).

Plaintiffs' lawsuit-exception theory stems from two recent Florida appellate decisions: *Weston v. Universal Prop. & Cas. Ins. Co.*, No. 2D2024-1340, 2025 WL 2989935, at *4 (Fla. Dist. Ct. App. Oct. 24, 2025), and *Brito v.*

*Citizens Prop. Ins. Corp.*, 415 So. 3d 252, 255 (Fla. Dist. Ct. App. 2025). This Court has rejected the logic underlying these decisions, *see Robert E. Pauly & Sandra M. Pauly Revocable Tr. v. Hartford Ins. Co. of the Midwest*, No. 2:24-CV-874-SPC-NPM, 2025 WL 1827635, at *2 (M.D. Fla. July 2, 2025), and Plaintiffs offer no good argument to reverse course now.

The problem with *Brito* and *Weston* is simple: they "believe that when an insurer initially denies coverage, the insured gets to rewrite the policy and elect how the insurer will settle its loss." *Id*. But that view gets things backwards. A breach-of-contract claim is meant to give a plaintiff the benefit of her bargain, not a better bargain than she ever signed up for. Under the plain terms of this policy, the benefit Plaintiffs purchased was a two-step payment process: ACV first, and RCV only after the checks are written to the contractors. *Brito* and *Weston* would effectively allow an insured to bypass that second step simply by walking into a courthouse. That cannot be right. A dispute over the scope of coverage does not act as a solvent, dissolving the specific conditions—like the requirement to incur expenses—that define the insurer's liability. To rule otherwise would convert a reimbursement policy into a cash-up-front windfall, granting Plaintiffs a payout they have not earned. *See, e.g., Qureshi*, 396 So. 3d at 567-68.

The holdings from *Brito* and *Weston* seem to be a rule of convenience: "our reading also places the payment-splitting provisions in perfect

7

alignment with the foundational proposition that disputes should be resolved in a single trial, rather than piecemeal." *Brito*, 415 So. 3d at 256. So to avoid two trials—one where the jury determines the scope of damages, and a second if the insured completes repairs and there is a dispute over the RCV payment—*Brito* and *Weston* simply combine the issues for expediency. While convenient, that approach undermines the policy's plain language. "Under Florida's binding law, . . . [c]ourts are not free to rewrite the terms of an insurance contract[,] and where a policy provision is clear and unambiguous, it should be enforced according to its terms." *Buckley Towers Condo., Inc. v. QBE Ins. Corp.*, 395 F. App'x 659, 663 (11th Cir. 2010).

National Fire insists Plaintiffs have undertaken no repairs or replacement (and Plaintiffs do not argue otherwise). So, to the extent Plaintiffs have not incurred any repair or replacement costs, their damages are limited to ACV. *See Ocean View Towers Ass'n, Inc. v. QBE Ins. Corp.*, No. 11-60447-CIV, 2011 WL 6754063, at *11 (S.D. Fla. Dec. 22, 2011) ("As QBE correctly argues, the policy plainly provides RCV coverage only after 'the lost or damaged property is actually repaired or replaced[.] . . . Here, the repairs have yet to occur; therefore, the policy does not afford RCV coverage."); *see also CMR Constr. & Roofing*, 843 F. App'x at 192.

Similarly, under the policy, there is no payment for increased construction costs due to ordinance or law, like building codes, unless those

8

costs are incurred. (*See* Doc. 26-1 at 18 (outlining that the policy does not cover law and ordinance damages unless "such damage results in enforcement of the ordinance or law").) Thus, if Plaintiffs have not incurred any repair or replacement costs, ordinance-or-law damages are unavailable too. *See Buckley*, 395 F. App'x at 665 ("[U]nder Florida law and under the terms of the contract, Buckley Towers is not entitled to law and ordinance damages because it never repaired the property and never actually incurred increased damages due to the enforcement of laws or ordinances.").

The Court will enforce these damage limitations at trial through jury instructions and, if needed, special interrogatories. But one point of clarification is needed. While Plaintiffs cannot *recover* replacement costs today, they are free to *prove* them. That is because RCV and ACV are inextricably linked. As the Florida Supreme Court has recognized, and the policy here provides, ACV is essentially replacement cost minus depreciation. (Doc. 26-1 at 12.) One implies the other. To calculate the depreciated value of a damaged roof or floor, a jury must first know the sticker price of a new one. Plaintiffs, therefore, must be permitted to submit their RCV figures—and the evidence supporting them—not as a separate measure of damages, but as the necessary mathematical baseline for arriving at their ACV figures for any disputed losses. *See, e.g.*, *J & H Auto Trim Co. v. Bellefonte Ins. Co.*, 677 F.2d 1365, 1369 (11th Cir. 1982) ("[A]lthough not synonymous with actual cash

9

value, replacement cost could be considered as one of the factors in determining actual cash value."); *Mason Dixon Contracting, Inc. v. Allied Prop. & Cas. Ins. Co.*, No. 5:19-CV-107-OC-30PRL, 2020 WL 5995664, at *4 (M.D. Fla. July 31, 2020).

## B. Actual Cash Value Does Not Include Repairs to Undamaged Property

National Fire's next argument follows logically from the first. If Plaintiffs are currently limited to recovering ACV, the question becomes: ACV of *what*? The policy provides a precise answer. It limits ACV to the cost to repair or replace property "at the time of direct physical loss or damage." (*See* Doc. 26-1 at 5.) In other words, the scope of the payment is defined by the scope of the physical injury. Consistent with the Court's finding that Plaintiffs are entitled only to ACV because they have not yet performed repairs, their recovery must be strictly limited to those specific portions of the property that sustained a "direct physical loss."

The Eleventh Circuit has endorsed a no-nonsense definition of that phrase. It has held that the words "direct" and "physical" modify "loss" to "impose the requirement that the damage be actual." *Mama Jo's Inc. v. Sparta Ins. Co.*, 823 F. App'x 868, 879 (11th Cir. 2020). This textual focus draws a sharp line between the damage itself and the work required to fix it. While replacing an undamaged portion of a roof or floor may be necessary to

10

effectuate a repair—and thus payable eventually as replacement cost—that undamaged property did not suffer a "direct physical loss." It was fine immediately after the storm; its loss is a consequence of the repair process, not the hurricane. Therefore, projected costs to replace undamaged property are not part of the ACV calculation.

Plaintiffs attempt to distinguish this line of authority by arguing that their proposed work on undamaged property—specifically regarding the interlocking flooring, cabinetry, and roof materials—is mechanically necessary to complete the repairs, rather than merely for aesthetic matching. (Doc. 27 at 7-11.) But "direct physical loss" looks to the condition of the property immediately following the storm, not the collateral consequences of the rehabilitation process. Whether the undamaged property must be removed for uniformity (aesthetics) or compatibility (mechanics), the fact remains that it was not physically altered by the hurricane. While these costs may well be recoverable as replacement costs once the work is performed— and the expense is actually "incurred in making such repair"—they do not constitute "direct physical loss" for the purpose of an up-front ACV payment.

Courts across this Circuit agree. *See, e.g.*, *Bahama Bay II Condo. Ass'n, Inc v. United Nat'l Ins. Co.*, 374 F. Supp. 3d 1274, 1283 (M.D. Fla. 2019) (finding that a policy limited to direct physical loss does not cover undamaged property); *CMR Constr. & Roofing, LLC v. ASI Preferred Ins. Corp.*, No. 2:19-

CV-442, 2021 WL 877560, at *7 (M.D. Fla. Mar. 9, 2021) (same); *Magnolia Lane Condo. Ass'n, Inc. v. Rockhill Ins. Co.*, No. 19-24202-CIV, 2022 WL 3566881, at *6 (S.D. Fla. June 24, 2022) (finding that undamaged sections of a roof were not covered where the policy was limited to direct physical loss).

Plaintiffs also try to find a foothold in the policy's specific provisions for "Ordinance or Law" and plumbing "tear-out" costs. (Doc. 27 at 5-6.) They point out that these sections explicitly cover the removal of undamaged property—for instance, to comply with building codes or to access a broken pipe—and argue that the policy therefore contemplates a definition of loss that extends beyond physical damage. (*Id.*) But this argument backfires. The very existence of these provisions proves that the general rule is the opposite. If the standard definition of "direct physical loss" already included the cost to remove or replace undamaged parts of a building whenever necessary to complete a repair, the specific "tear-out" and "Ordinance or Law" provisions would be superfluous—mere ink on the page doing no work. An insurance policy, like any contract, must be read to give effect to every clause, avoiding an interpretation that renders specific provisions redundant. *See Equity Lifestyle Props., Inc. v. Fla. Mowing and Landscape Serv., Inc.*, 556 F.3d 1232, 1242 (11th Cir. 2009). By explicitly extending coverage to undamaged property in these two narrow circumstances, the policy implies that such coverage is unavailable for a standard windstorm claim. The exception proves

12

the rule: generally, if property was not physically altered by the storm, the policy does not pay to replace it.

Because Plaintiffs' "mechanical necessity" costs are essentially replacement costs in disguise, they must wait until the repairs are done. Like above, the Court will enforce this limitation on damages through jury instructions and evidentiary rulings as needed.

## C. Screen Enclosure Damages

National Fire lastly argues that damage to the home's aluminum-framed screen enclosure is not covered under the policy. (Doc. 26 at 15.) It is undisputed that the claim here involves a "Hurricane Loss," as defined by the policy. (Doc. 26-1 at 2.) In those circumstances, the policy excludes damage to "aluminum framed screen enclosures." (Doc. 26-1 at 23.) National Fire argues that the estimate prepared by Tradewinds Custom Homes for "screen enclosure" falls under this policy exclusion. (*See* Docs. 26-1 at 23, 26-5.) Plaintiffs offer no response to this argument.

Based on the record, the Court cannot grant summary judgment. National Fire presents no evidence that the estimate for "screen enclosures" meets the policy's exclusion. The Court does not have a photo of the screened area or a document explaining what the enclosure is. Because National Fire has not met its burden, summary judgment on this issue is improper. National Fire can marshal such evidence at trial where a directed verdict

might be appropriate, but it is not for the Court to decide on an undeveloped record.

## IV. Conclusion

Accordingly, it is now **ORDERED**:

Defendant's Motion for Summary Judgment (Doc. 26) is **GRANTED IN PART AND DENIED IN PART** as set forth above.

**ENTERED** in Fort Myers, Florida on January 30, 2026.

Kyle C. Dudek
United States District Judge